# EXHIBIT A

Ronald Lee, II
April 17, 2025

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO.:  8:24-CV-01667-SDM-UAM

Ronald Lee, II, and Proven,
Industries, Inc.,

        Plaintiffs,

-vs-

Pacific Lock Company, a/k/a
Paclock, and Gregory B. Waugh,

        Defendants.

_____/

VIDEOTAPED DEPOSITION OF THE CORPORATE REPRESENTATIVE OF
PROVEN INDUSTRIES, INC.

WITNESS:  RONALD LEE, II
DATE:     Thursday, April 17, 2025
TIME:     9:36 a.m. - 4:52 p.m.

Johnson Pope, et al.
400 North Ashley Drive, Suite 3100
Tampa, Florida

Stenographically Reported By:
Joanne Caudill, FPR
Florida Professional Reporter

Ronald Lee, II
April 17, 2025

1    portion that the puck lock fits into?

2        A.    Behind -- right behind it.

3        Q.    The receptacle?

4        A.    Yeah.

5        Q.    Okay.  So as -- as I understand it, the 2516 is

6    essentially a cylinder or two parts that form a cylinder

7    and then the puck lock, the hidden shackle in the puck

8    lock, secures those two pieces together; is that correct?

9        A.    Yeah.

10        Q.    Okay.  And then around the -- not the front of

11    the puck lock, but around the -- the side of the puck

12    lock, there is a shield of metal; is that correct?

13        A.    Yes.

14        Q.    Okay.  Have I now described the 2516?

15        A.    Not to its entirety, but...

16        Q.    Okay.  When did -- okay.  So when you first

17    conceived of the 2516, did you fabricate one yourself?

18        A.    Yeah.

19        Q.    Okay.  And then did you go through that same

20    process where you had a drawing made of it and then had

21    it made by other people?

22        A.    I mean, at some point, we had a drawing made of

23    it, yeah.

24        Q.    And who made the drawing of it?

25        A.    I -- I don't --

Ronald Lee, II
April 17, 2025

1      Q.   Was that done by somebody at Proven Industries

2  or somebody else?

3      A.   I wouldn't remember exact.

4      Q.   Well, did Proven Industries have a CAD machine

5  at the time?

6      A.   No, no.

7      Q.   Okay.  So it would have been sent to somebody

8  who had access to a CAD machine; correct?

9      A.   Yeah.  Yeah, somebody that had CAD.  Yeah.

10     Q.   Yeah.

11          So it was sent to an outside engineer, kind of

12  like the first time; right?

13     A.   I can't remember.  I don't remember the

14  entirety of that -- of that one.

15     Q.   But you know it wasn't done in-house, and you

16  had to send it to somebody who had a CAD machine; right?

17     A.   Yeah, more or less.

18     Q.   And -- well, what -- what part of that isn't

19  not entirely accurate?

20     A.   I didn't do it personally.  So...

21     Q.   Who did it?

22     A.   I don't recall the -- I've had a lot of

23  different people help with this because that's not my

24  expertise, you know, doing the -- the -- the CAD.  So...

25     Q.   Okay.  But you know it wasn't done with

Ronald Lee, II
April 17, 2025

1    somebody who is employed by Proven Industries; correct?

2        A.    Correct.

3        Q.    Okay.  Did you have an agreement with the

4    person who did the CAD drawing of the 2516?

5        A.    The only time I ever have done, like, those

6    agreements is with companies that have, like, a capacity

7    to make something.

8        Q.    Okay.

9        A.    Because I've always felt like I didn't have the

10   risk of, you know, somebody else making it that didn't

11   have the -- the knowledge or the ability to.

12       Q.    Okay.  So it's accurate to say that there was

13   not a nondisclosure when you handed your fabricated 2516

14   to somebody who then created a CAD drawing of it;

15   correct?

16       A.    It's safe to assume that because the likelihood

17   of an individual taking it from a drawing and

18   manufacturing, bringing it to market is likely to none

19   because I've had no one else do it.

20       Q.    Okay.  And so you didn't have a noncompete with

21   the person to whom you gave your self-fabricated 2516;

22   correct?

23       A.    Yeah.  I would say I selected carefully on who

24   would be a risk to take advantage of my product, yeah.

25       Q.    Okay.  And I'm going to keep asking this

Ronald Lee, II
April 17, 2025

1  question until I get a direct answer.

2      A.    Okay.

3      Q.    So we can -- we can do this ad infinitum or

4  into infinity.

5      A.    Oh.

6      Q.    So I'm going to ask you again.

7          Isn't it correct to say you did not have a

8  noncompete with the person to whom you gave your

9  self-fabricated 2516 trailer coupler lock so that they

10  could make a drawing of it?

11      A.    I only required companies that could

12  manufacture.  So I did not have any individual sign a

13  nondisclosure agreement.

14      Q.    Okay.  And what did you do when you got the

15  drawings that were generated by the person who made the

16  drawings for you of the 2516 that you had fabricated?

17      A.    Probably sent them out to be manufactured.

18      Q.    And who did you send it out to be manufactured

19  to?

20      A.    It was either that Laser place or I used a --

21  at some point, I switched to, like, a local -- more local

22  job shop that had the tube lasers.  So I sent it to them.

23      Q.    And what was the name of that company, the more

24  local one?

25      A.    I think Val- -- Valiant Products.

Ronald Lee, II
April 17, 2025

1       Q.   Okay.  And that was with Pacific Lock Company;

2   right?

3       A.   Yes.

4       Q.   Okay.

5       A.   The entirety.

6       Q.   All right.  And you didn't have a noncompete or

7   a nondisclosure agreement or an agreement of any kind

8   with the company that you sent those drawings to to

9   fabricate the 2516 trailer coupler lock; correct?

10           MR. JAKES:  Objection; asked and answered.

11           THE WITNESS:  Correct.

12  BY MR. FEE:

13      Q.   All right.  And did you give your trailer

14  coupler lock that you fabricated to the person who made

15  the drawings of it before you entered into a -- an

16  agreement with Pacific Lock Company?

17      A.   No.  Of the -- of the original -- this one?

18      Q.   Of any -- okay.  Let me -- let me back up.

19           With regard to the 2516, you testified that

20  you -- you self-fabricated one; correct?

21      A.   Yeah.

22      Q.   And then you gave it to a guy who made a

23  drawing; correct?

24      A.   Correct.

25      Q.   Okay.  Did that happen before or after you

Ronald Lee, II
April 17, 2025

```
 1   don't remember the exact dates, but somewhere 2017 or
 2   '16, something.
 3        Q.   Would 2017 be the approximate middle of her
 4   employment?
 5        A.   I'm not sure.  I mean, this is -- we've had a
 6   lot of employees.  So you're going to --
 7        Q.   And what -- what did Erica Sanchez do as a
 8   customer service employee of Proven?
 9        A.   Answer any questions or assist customers that
10   inbound calls or outbound.
11        Q.   Was she always a W-2 employee?
12        A.   Yes.
13        Q.   Never a 1099 contractor?
14        A.   No.
15        Q.   And did she have an NDA with Proven?
16        A.   No.
17        Q.   And by NDA, I mean a nondisclosure agreement.
18   Is that what you understand it?
19        A.   I mean, I -- I think I can sum it with I don't
20   think we have a formal NDA, any of the employees sign it.
21        Q.   All right.  And has Proven Industries ever had
22   an NDA with any of its employee, a nondisclosure
23   agreement?
24        A.   I don't think we've ever had, like, a formal
25   NDA.  I think we had it -- like, it was some other type
```

Ronald Lee, II
April 17, 2025

1  of agreement or some other type of thing.  I'm not -- we

2  changed.  We had that Bambi service because it was

3  affordable, and at least we can start getting things in

4  order.

5        I don't remember the exact date we started

6  using it, but I think we used it for a few years before,

7  and that's when we were trying to, like, get to, like,

8  more, like, formally where -- where we think that we

9  should be.  So...

10     Q.   And are you aware that my clients, both Paclock

11  and Mr. Waugh, have requested that Proven Industries

12  produce any nondisclosure agreements with -- with

13  anybody?  Are you aware of that request?

14     A.   I think so.  I think I've seen that, yeah.

15     Q.   Are you aware of Proven Industries producing

16  any such document?

17     A.   For nondisclosures?

18     Q.   Yes.

19     A.   Proven itself entirety, I don't think so, no.

20  The only nondisclosure I had was when, like -- for Greg

21  only because of what his capabilities are, and he already

22  had a sheet metal, like, similar -- not -- I'm sorry -- a

23  sheet metal product that took, like, similar

24  manufacturing to make.  So that was the only concern I

25  had was he was established.

Ronald Lee, II
April 17, 2025

1   similarities of the products is a pure coincidence in

2   your view?

3           MR. JAKES:  Object to the form.

4           THE WITNESS:  I don't think it's a coincidence,

5       no.  I just think it is what it is.

6   BY MR. FEE:

7       Q.   Okay.  So you were not inspired by that

8   product?

9       A.   I -- I did not know that product existed.  And

10  that's probably -- probably the reason why we

11  outperformed them and then we eventually wound up

12  acquiring is because of that same exact.  Because I was a

13  consumer looking for a good product initially.

14      Q.   I'd like to show you what's being marked as

15  Exhibit 6 to your deposition.

16          (Defendant's 6, May 6, 2013, printout of the

17  GusHill Industries website trailer lock page, was marked

18  for identification.)

19  BY MR. FEE:

20      Q.   Exhibit 6 to your deposition is a printout from

21  the internet archive, which has a URL of

22  web.archive.org/web.  It's a May 6, 2013, printout of the

23  GusHill Industries website trailer lock page, and it

24  describes on the first page the, quote, DaBull, close

25  quote, product is a, quote, three-piece trailer hitch

Ronald Lee, II
April 17, 2025

1    lock comprised of the tongue which locks the coupler, the

2    sleeve which mates with the tongue and covers the

3    coupler, and a lock -- and the lock case hardened six-pin

4    lock from Pacific Locks or an 11-pin ASSA high-security

5    lock.

6            It says DaBull comes in two sizes, Model 200

7    for 2-inch trailer balls and a Model 2516 for

8    2-and-5/16-inch trailer balls.

9            Do you see that?

10    A.    (Witness nodding head.)  Yes.  Oh.  Yes.

11    Sorry.

12    Q.    Yes.

13            And, in fact, DaBull was advertising or --

14    strike that.

15            GusHill Industries was advertising a Model 2516

16    trailer coupler lock back in 2013 before you even

17    conceived of such a lock; correct?

18    A.    Yeah, looks like it.

19    Q.    And the 2516 lock at Proven Industries is a

20    three-piece trailer hitch lock; correct?

21    A.    Correct.

22    Q.    Which is comprised of a tongue which locks the

23    coupler; correct?

24    A.    Yes.

25    Q.    And a sleeve which mates with the tongue and

Ronald Lee, II
April 17, 2025

1    covers the coupler; correct?

2        A.    Yes.

3        Q.    And a hardened six-pin lock from Pacific Locks

4    at least in the beginning; right?

5        A.    I mean, I think Greg had a couple different

6    specs.  I don't know if I had the same.

7        Q.    But it used a puck lock just like --

8        A.    Oh.

9        Q.    -- DaBull used; correct?

10       A.    Yeah, puck lock.  Correct.  Yeah.

11       Q.    Okay.  And you think that's a coincidence that

12   they had that product before you conceived of yours?

13           MR. JAKES:  Object to the form.

14           THE WITNESS:  That's -- that's all it is

15       because I had no knowledge of this company.  If --

16       if -- if I had knowledge of this company when I was

17       actively looking for a trailer lock, I would have

18       purchased it and I probably never would have even

19       done the Proven Industries brand.

20   BY MR. FEE:

21       Q.    And is it a coincidence that you contacted

22   Pacific Lock to buy the puck locks for your 2516?

23           MR. JAKES:  Object to the form of the question.

24           THE WITNESS:  A coincidence in what capacity?

25   BY MR. FEE:

Ronald Lee, II
April 17, 2025

1    corner where it says, "Easy as 1 - 2 - 3"?

2            Do you see that?

3        A.    Yeah.

4        Q.    And is that describing the three components of

5    your 2516 lock?

6        A.    I mean, not to the same functionality, a total

7    functionality.  It's close; it's similar.

8        Q.    What -- what is depicted at the bottom

9    left-hand corner of Exhibit 8 then, where it says "Easy

10   as 1 -2- 3"?

11       A.    That's the 2178.

12       Q.    Okay.  When did Proven start selling the 2516?

13       A.    Maybe late '14 or '15.

14       Q.    And your testimony is that that was an upgrade

15   to the 20 -- what's the 27?

16       A.    2178.

17       Q.    2178.

18       A.    So --

19            MR. JAKES:  Object to the form.

20            THE WITNESS:  To help it with it, that 2178 is

21        a 2-inch or inch and 7/8.

22   BY MR. FEE:

23       Q.    Right.

24       A.    Yeah.

25       Q.    Referencing the size of the trailer hitch ball?

Ronald Lee, II
April 17, 2025

1      Q.   When did Proven Industries first start selling
2  the 24- -- or 2615 -- shoot.  I'm messing up on the
3  name -- 2615 or 2516?
4           When did Proven Industries start selling the
5  2516 trailer hitch coupler lock?
6      A.   Approximately I think sometime in '14 to 2015.
7      Q.   Okay.  When did Proven Industries start selling
8  the 2178 trailer hitch coupler lock?
9      A.   Officially selling it.  So mind you, I'm
10  working at this time too a full-time job.  So I know I
11  wasn't creating revenue to really sustain.  So I don't --
12  I don't -- I don't really recall the exact date we
13  started selling it.
14      Q.   Was it 2011?
15      A.   I mean, we can -- you can go after each day --
16  or each year until I say yes, but I do not recall --
17      Q.   Was it --
18      A.   -- the year.
19      Q.   Was it 2012?
20      A.   I don't recall.
21      Q.   Was it 2013?
22      A.   I don't recall.
23      Q.   Was it 2014?
24      A.   I don't recall, but it's getting closer to -- I
25  know 2015 we were really -- 2015, 2016 is when we really

Ronald Lee, II
April 17, 2025

1    lowercase, related to a trade, capital T, secret, all

2    lowercase, of coupler lock for trailers that will use a

3    puck-style lock, which you then define as being trade

4    secret, capital T, secret, all lowercase.

5            Do you see that?

6        A.   Yes.

7        Q.   Okay.  What confidential information and

8    proprietary information did you have relating to a trade

9    secret for a coupler lock for trailers that will use a

10   puck-style lock as of August 25, 2014?

11       A.   So just at that time we entered into it?

12       Q.   Yes.

13       A.   I was working on the -- our 2516 and that full

14   face.

15       Q.   All right.  That's because the -- the 2178 was

16   already out there; right?

17       A.   Correct.

18       Q.   Okay.  So everybody knew about the 2178?  It

19   was publicly available?

20       A.   I mean, yeah, yeah.  Agreed.

21       Q.   Sure.

22       A.   Agreed.

23       Q.   And I could look at the 2178 or so could

24   anybody else on August 24th of 2014, and I could know

25   what it was made out of; right?

Ronald Lee, II
April 17, 2025

```
 1        A.    I can't remember if we -- did we list it on --
 2   on the website, what it was made of?
 3        Q.    Well, if I bought one --
 4        A.    I don't think --
 5        Q.    -- I could determine what it was made of;
 6   correct?
 7        A.    Okay.  I thought you were saying, like, looking
 8   on the site.  I apologize.
 9        Q.    All right.  If I bought one, I could see what
10   it was made out of; right?
11        A.    Yeah.  In most cases, yeah, I believe so.
12        Q.    And I could -- I could break it down into its
13   three constituent parts, which I would have to do anyway
14   to install it; right?
15        A.    Yeah.
16        Q.    And I could determine the thickness of the
17   metal; correct?
18        A.    If you had calipers.
19        Q.    Sure.
20              And I could determine the configuration of all
21   its parts and pieces; right?
22        A.    For that specific model, yeah.
23        Q.    Okay.  And once the 2516 was on sale, I could
24   do exactly that same analysis, couldn't I?
25        A.    In theory, yeah.
```

Ronald Lee, II
April 17, 2025

```
 1        Q.   Sure.
 2             All right.  So what confidential information
 3   and proprietary information and materials did you have as
 4   of August 25, 2014, relating to a trade secret of a
 5   coupler lock for trailers that will use a puck-style
 6   lock?
 7             MR. JAKES:  Objection.  Asked and answered.
 8             THE WITNESS:  Yeah, that's why I was confused.
 9        I'm like, did I miss something here?
10   BY MR. FEE:
11        Q.   Specifically?
12             MR. JAKES:  Same objection.
13             THE WITNESS:  Yeah, I mean the full face design
14        we're doing, like a redesign change in the product
15        that was going to make it easier -- easier for
16        manufacturing and easier for customers to use and so
17        on.
18   BY MR. FEE:
19        Q.   So just the full face design.  There's nothing
20   else, just the full face design?
21        A.   At --
22        Q.   As of that day?
23        A.   The day of --
24        Q.   Yes.
25        A.   Yeah, more or less.
```

Ronald Lee, II
April 17, 2025

1    Q.    Well, not --

2    A.    I mean, sorry, sorry.  Yes.

3    Q.    Okay.  And how long was this agreement to last?

4    A.    The way I envisioned it, to -- I mean, I felt

5    like we were going to have a long working relationship

6    and it was going to continue, and so it would be ongoing.

7    That's why I didn't put a date on it.

8    Q.    Would it -- would it last for ten years?

9    A.    I think more like 100.

10    Q.    So it would last for 100 years?

11    A.    Yeah.

12    Q.    You anticipated my next question.

13    A.    Yeah.

14    Q.    Thank you.

15          And paragraph 7 states, "Recipient shall not

16    directly or indirectly acquire any interest in or design,

17    create, manufacture, re-engineer, sell, or otherwise deal

18    with any item or product containing, based on, or derived

19    from the CONFIDENTIAL INFORMATION, PROPRIETARY

20    INFORMATION" -- all of that's capitalized, Confidential

21    Information, Proprietary Information is in all caps --

22    "and information concerning said provisional patent

23    except as may be expressly agreed to in writing by the

24    inventor."

25          Do you see that?

Ronald Lee, II
April 17, 2025

1      A.    Yes.

2      Q.    What provisional patent is being referred to?

3      A.    So when I did this -- when I did this agreement

4  I used an older agreement, and I thought I edited it

5  correctly, and I didn't.

6      Q.    So what provisional patent is being referred to

7  in paragraph 7?

8      A.    There wasn't a provisional patent.

9      Q.    So if there's no provisional patent, then

10  there's no prohibition on Paclock doing anything stated

11  in 7 because it says "information concerning said

12  provisional patent."

13          Do you see that?

14          MR. JAKES:   Object to the form.

15          THE WITNESS:   Okay.

16  BY MR. FEE:

17      Q.    Do you agree with that?

18      A.    No, because it was supposed -- I mean,

19  clerical.  I -- I had a document.

20      Q.    So you don't -- you think that we should ignore

21  that phrase in the agreement that you prepared and sent

22  to Paclock?

23      A.    I wouldn't say you have to ignore it because I

24  can explain it.

25          MR. JAKES:   Object to the form.

Ronald Lee, II
April 17, 2025

1      A.    Yes.

2      Q.    And what is the reason that you're asking them

3  to do that?

4      A.    Because he currently wasn't making any coupler

5  locks for trailers, and if he wasn't provided the

6  information that we gave him, he probably never would

7  have been into it.

8      Q.    Okay.  You are -- you are getting really good

9  at anticipating questions.

10          MR. JAKES:  Object to the commentary, but thank

11      you.

12  BY MR. FEE:

13      Q.    It's a compliment.  I didn't think you would

14  mind that.

15          MR. JAKES:  Commentary.

16  BY MR. FEE:

17      Q.    So what information is it that you think that

18  Mr. Waugh and Paclock are using improperly?

19      A.    So the information they're using improperly,

20  they redesigned our product.  Throughout the course of

21  our relationship, we discussed -- we discussed multiple

22  improvements on what I was working on and suggestions and

23  going back and forth with stuff and ideas, me running by

24  him about doing revisions to the puck lock.  And one of

25  them was the bolting the puck lock on the face of the

Ronald Lee, II
April 17, 2025

1  coupler.

2      Q.  Okay.  So you think he used -- that Mr. Waugh

3  and Paclock used information about bolting the puck lock

4  to the front of the trailer hitch coupler lock, and you

5  think that that was improper; is that correct?

6      A.  One of our conversations that I can recall is

7  at that time Greg did make a -- a puck lock that bolted

8  onto a hasp.  I think he currently has, but I was

9  inquiring if I can do that with puck locks that we could

10  purchase from him and bolt it onto the front of ours.

11     Q.  Front of your what?

12     A.  I'm sorry.  The front of our coupler lock.

13     Q.  All right.  And you think that -- that Paclock

14  bolting a puck lock to the front of a trailer hitch

15  coupler lock is improper; correct?

16          MR. JAKES:  Object to the form.

17          THE WITNESS:  Yes.

18  BY MR. FEE:

19     Q.  Okay.  Because you think that the reason that

20  that was done was based on your question posed to

21  Mr. Waugh?

22     A.  Well, beyond the question, it was something we

23  were pursuing to do.

24     Q.  Okay.  When did that conversation -- what was

25  the first conversation about bolting a puck lock to the

Ronald Lee, II
April 17, 2025

1  front of a trailer hitch coupler lock, first

2  conversation?

3      A.   It was in between 2014 and 2019.

4      Q.   Can you be more specific?

5      A.   I can't fully recall.  There's nothing to

6  really -- that I can think of that really can make me

7  remember the exact day, but it was at some point when I

8  got knowledge of that he had his puck locks bolt onto his

9  hasp that I inquired.

10     Q.   All right.  And it was sometime during a

11 five-year period and you cannot be more specific;

12 correct?

13     A.   I mean, it was probably midship of the

14 relationship.

15     Q.   So my question is when did that first

16 conversation occur?

17          MR. JAKES:  Objection.  Asked and answered.

18          THE WITNESS:  Between 2016 to 2018.

19 BY MR. FEE:

20     Q.   All right.  Where were you when you had that

21 first conversation?  Were you at home, driving in your

22 car?  Where were you?

23     A.   I believe I was at maybe the office.

24     Q.   All right.  And which office?

25     A.   The Dock Street.

Ronald Lee, II
April 17, 2025

1       A.   Yeah.  I think he said it wouldn't be a charge

2   at all --

3       Q.   Okay.

4       A.   -- because it was aluminum puck locks and

5   stuff.

6       Q.   What else did you say to Mr. Waugh during that

7   conversation?

8       A.   That was the main point of the -- of the call.

9   I might have asked him how he was doing.  I might have

10  asked him how's business, talked -- you know.

11      Q.   All right.  Do you recall anything else about

12  that phone call?

13      A.   I don't know what else there would be to

14  remember.

15      Q.   All right.  Did you ever have any other

16  conversation with Greg Waugh that relates to the bolting

17  of a puck lock or having holes drilled in a puck look so

18  it could be bolted?

19      A.   No.  I don't remember talking to him again

20  about it.  I remember we were experimenting with, and I

21  drilled holes in the front of a -- of a coupler lock

22  and -- or we might have had a fab shop do it, and then --

23  what is it? -- putting -- putting the holes for the puck

24  lock and then drilling the holes and trying it.  And just

25  on the level of stuff that we sell, it was, like, an

Ronald Lee, II
April 17, 2025

1   overtaking task to be able to do that to everything for

2   the -- for the offset of what it --

3       Q.   Okay.

4       A.   -- service it provided.

5       Q.   To be clear, I'm not asking you what you did.

6   I'm asking you what you said to Greg Waugh about the

7   bolting of a puck lock or the drilling holes in a puck

8   lock so it could be bolted, everything you've ever said

9   to him about that.

10      A.   I think that was the start and stop of the part

11  of it because that's all that was said.

12      Q.   Okay.  And you asked him what it would cost to

13  drill holes or to sell puck locks that had holes in the

14  back; right?

15      A.   To add two -- basically two more features on

16  the back of the puck lock.

17      Q.   And he told you it wouldn't cost anything --

18      A.   Correct.

19      Q.   -- because they already do it?

20      A.   They do it for their -- yeah, their hasp that

21  bolt on.

22      Q.   Okay.  All right.  What other information do

23  you believe that Greg Waugh or Paclock used improperly?

24      A.   Additional.  I think I remember discussing

25  something with our change in our wing design for the lock

Ronald Lee, II
April 17, 2025

1   to add that for alignment issues.

2       Q.   Okay.  When did you have that conversation with

3   Mr. Waugh?

4       A.   Probably within the same window of time,

5   2016-2018.

6       Q.   Okay.  Where were you during the first

7   conversation you ever had with Mr. Waugh about that?

8       A.   That one, I can't specifically remember the

9   exact location.

10      Q.   Did you have one call or multiple calls with

11  Mr. Waugh about a change in the wing design?

12      A.   I think the call that we had for that, it got

13  brought up in normal conversation of issues and troubles

14  or whatever.  It wasn't, like, a direct call.  Every once

15  in a while I would reach out to Greg or he'd reach out to

16  me.

17      Q.   Okay.  Who called who when you first mentioned

18  a change in the wing design?

19      A.   That I can't recall because -- because of the

20  conversation wasn't geared towards just that.

21      Q.   All right.  Do you know how many phone calls

22  you had with Mr. Waugh in which a change in wing design

23  was discussed?

24      A.   I think maybe just the one because maybe there

25  was a combination of venting and slash going over what we

Ronald Lee, II
April 17, 2025

1  think that would make it change or...

2      Q.    Please tell me everything that you can recall

3  that you told Mr. Waugh about a change in the wing

4  design.

5      A.    That we were having trouble with the alignment

6  issue and we decided to make the wings longer on the back

7  end of it.

8      Q.    All right.  Anything else?

9      A.    No.  Because it was a -- a general

10  conversation.  It wasn't like a -- a calling for what do

11  you think we should do, or is there a problem.  It was

12  just general conversation.

13      Q.    All right.  And when is it that Proven first

14  sold a trailer hitch coupler lock with a changed wing

15  design?

16      A.    I can't recall when we -- we went to...

17      Q.    Did the model number change?  Was there any

18  change in the designation?

19      A.    No, the -- yeah, the model number designation

20  didn't change.  It was just a revision or something.

21      Q.    Did that change occur before 2019?

22      A.    Yeah, yeah.

23      Q.    Did it occur before 2018?

24      A.    Yep.

25      Q.    Did it occur before 2017?

Ronald Lee, II
April 17, 2025

1    A.    Yes.

2    Q.    Did it occur before 2016?

3    A.    I believe it was between 2016, maybe as -- 2000

4    and -- oh, no, no.  Yeah.  2- -- I'm going to say -- I'm

5    guessing at this point -- 2015 to 2017, just guessing,

6    giving an approximate.

7    Q.    Okay.  And when there was a change made to the

8    wing design on the 26 -- 5 -- I'm sorry -- 2516 model,

9    was that model sold with the changed wing design?

10   A.    At some point it was.

11   Q.    Okay.  And if I was to purchase a 2516 with a

12   changed wing design in, say, 2017, to be safe, would I

13   have been able to see what the wing design was?

14   A.    I think you would be -- you would definitely be

15   able to see it but maybe not know why it was the way it

16   was.

17   Q.    Have you now told me everything Proven knows

18   about the disclosure of a change of wing design to

19   Mr. Waugh or Paclock?

20   A.    As I can recall at this moment, yes.

21   Q.    Okay.  What other information, if any, did

22   Mr. Waugh or Paclock use improperly?

23   A.    Am I allowed to look through anything?

24   Q.    Whatever you want to look at.

25   A.    Okay.

Ronald Lee, II
April 17, 2025

```
 1        Q.    Okay.   Just if you could put on the record what
 2   you're looking at when you answer my question.
 3        A.    Okay.
 4        Q.    Or to assist you in answering the question.
 5              Right now it looks like you're reading an
 6   interrogatory answer?
 7        A.    Correct.   Yeah.
 8        Q.    Okay.   I had asked you to put on the record
 9   what you're looking at.
10        A.    Oh, I thought before I answered it.
11        Q.    Okay.   Well, you can --
12        A.    I apologize.   'Cause I didn't know if I would
13   get the answer I need from this.
14        Q.    Are you getting the answer you need from that?
15        A.    I'm trying to.
16              Okay.
17        Q.    All right.
18        A.    Yeah.
19        Q.    So do you recall my question?
20        A.    If you want to repeat, just to make sure.
21        Q.    Yes.
22              What other bad information -- what other
23   information did Mr. Waugh and/or Pacific Lock Company use
24   that you believe is improper?
25        A.    Okay.   Yes, I feel like I answered.
```

Ronald Lee, II
April 17, 2025

1   mean, like anything, you have a -- have to have a

2   combination of marketing and a good product.

3        Q.   If you turn to Exhibit B to the complaint.

4             There you go.

5             At any time, did you or Proven Industries ever

6   share Exhibit B with Mr. Waugh or anybody at Paclock?

7        A.   No.  I don't -- I don't recall that.

8        Q.   No part of this was shared with Proven

9   Industries -- or with Paclock or Mr. Waugh; correct?

10       A.   I'm -- I'm pretty sure we -- we didn't.  I do,

11  like, think at some time I asked him -- because, I mean,

12  Greg has a -- Paclock has a lot of connections and with

13  manufacturing.  So I might have possibly asked him about

14  the fabrication of the -- if it's something that they can

15  do when I was having problems with my vendors and stuff,

16  but I don't think I ever -- I don't think I sent him any

17  of the official drawings.

18       Q.   So when I'm looking at this, it's -- it's dated

19  April 22nd of 2016.

20            Do you see that?

21       A.   Yes.

22       Q.   Okay.  When -- when was what is shown on the

23  first page first designed?

24       A.   I mean, it's changed so many times.  I don't

25  know the exact.

Ronald Lee, II
April 17, 2025

1    padlock to make it work on this.

2        Q.    Okay.  So my question is, for example, on the

3    first page of Exhibit B, if you look there's dimensions,

4    which I take it to be in inches, like 1.43, 4.92, 4.77.

5            Do you see all those numbers?

6        A.    I'm sorry.  This one?

7        Q.    This page.

8        A.    Yeah.

9        Q.    The first page.

10       A.    Okay.

11       Q.    You see those numbers --

12       A.    Yeah.

13       Q.    -- that I'm reading off?

14       A.    Yeah.

15       Q.    Did you ever disclose those to Mr. Waugh or

16   anybody at Paclock?

17       A.    Exact dimensions of this part?

18       Q.    Yes.

19       A.    I would say no, maybe that tab on there for

20   offsets because at some point we used -- they used one of

21   his stepped-back puck locks, and then we had to change it

22   to a -- a flat-back puck lock.  So we had to make sure we

23   could make everything work with the tab.  It's one of

24   those ongoing.

25       Q.    And all the information you disclosed to

Ronald Lee, II
April 17, 2025

1    Mr. Waugh was -- was transmitted by phone; correct?  In a

2    phone call?

3         A.    Yeah, some basic measurements, yeah.

4         Q.    Yeah.

5         A.    -- and offsets.

6         Q.    If you -- did you say "except"?  "Except basic

7    measurements and offsets"?

8         A.    Oh, no, no.  Basic measurements.

9         Q.    Okay.  So you wouldn't have in a phone call

10   said we needed to be 0.1950, would you?  You wouldn't

11   give that information only orally by phone, would you?

12        A.    Yeah, I would have to confirm -- yeah, I

13   wouldn't have to give that exact -- I mean, I think -- I

14   don't know.  Maybe he sent us the puck lock to see if we

15   can fit it.

16        Q.    I'm asking what you told him.  You would never

17   have tried to relay tolerance information down to the

18   hundredth or thousandth of an inch over the phone, would

19   you?

20        A.    Maybe for this part here or --

21        Q.    Which part are you referring to?

22        A.    -- or I would tell him what I'm doing, and he

23   would send me, like, a sample product so I can test it

24   and -- and then feed information back to him.

25        Q.    Yeah.  My question is not whether you were

Ronald Lee, II
April 17, 2025

1    Q.    You think you would have.  Do you know that you
2    did?
3    A.    It feels like I -- it feels familiar, but I
4    cannot put a exact on it.
5    Q.    Do you know exactly what you said?
6    A.    No.  Exactly what I said, no.
7    Q.    Do you know approximately what you said?
8    A.    I would have been questioning about the hole
9    size and the -- the width, and I --
10   Q.    Because the shackle needs to fit through the
11   hole?
12   A.    Correct.  And most likely I requested a sample.
13   Maybe they will be able to track it, if they sent it,
14   but -- or I can try to see if I can find something
15   requesting it or a bill or invoice.  So, yeah, we can --
16   I can -- I can nail it down.
17   Q.    How long do you think Paclock should be
18   precluded from using any of the information that you
19   described, the -- specifically the bolting of a puck lock
20   to the front with the two holes in it and what the cost
21   would be and the change in the wing design?
22        MR. JAKES:  Object to the form.
23        THE WITNESS:  I would think indefinitely based
24   off of, if we rewind this and there was a question in
25   regards to, hey, Ron, I need a date on this NDA, I

Ronald Lee, II
April 17, 2025

1      A.    I might have seen it, but -- I mean...

2      Q.    Do you think Peter Ganjian is a liar?

3      A.    I mean, I think that Ganjian is actually an

4  elite person, and I don't think he would lie.

5      Q.    Let's -- let's take a brief break, maybe ten

6  minutes.

7            THE VIDEOGRAPHER:  It's 4:40.  We're going off

8      the record.

9            (Thereupon, a short recess was taken, after

10     which the following proceedings were had:)

11           THE VIDEOGRAPHER:  It's 4:51.  We are back on

12     the record.

13  BY MR. FEE:

14     Q.    All right.  Mr. Lee, did anybody at

15  Proven Industries other than you divulge any information

16  that is confidential, proprietary, or trade secret to

17  Mr. Waugh?

18     A.    No, just me.  Yeah.

19     Q.    Okay.  Did anybody other than you divulge any

20  information that is confidential, proprietary, or trade

21  secret to Paclock?

22     A.    No.  I think it was just me.

23     Q.    Okay.  And did you divulge any information that

24  is confidential, proprietary, or trade secret in writing?

25     A.    No.

Ronald Lee, II - Confidential
April 17, 2025

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA

CASE NO.:  8:24-CV-01667-SDM-UAM

Ronald Lee, II, and Proven,
Industries, Inc.,

       Plaintiffs,

-vs-

Pacific Lock Company, a/k/a
Paclock, and Gregory B. Waugh,

       Defendants.
_____/

CONFIDENTIAL

VIDEOTAPED DEPOSITION OF CORPORATE REPRESENTATIVE OF
PROVEN INDUSTRIES, INC.

WITNESS:  RONALD LEE, II
DATE:     Thursday, April 17, 2025
TIME:     4:52 p.m. -  5:20 p.m.

Johnson Pope, et al
400 North Ashley Drive, Suite 3100
Tampa, Florida

Stenographically Reported By:
Joanne Caudill, FPR
Florida Professional Reporter

Ronald Lee, II - Confidential
April 17, 2025

```
 1   our product line is, or additional locks.  So with us

 2   losing a potential customer off of this -- our coupler

 3   lock dispute we have with Greg, we could be losing a lot

 4   more, tenfold.

 5             One, I don't know how much his true sales are

 6   of it, and then if you throw that calculation in there as

 7   well with the returning customers, then it would drive it

 8   up even further.

 9       Q.   And so would -- how is it that you're

10   calculating what your loss would be?  Is it lost profits?

11       A.   Profit -- profits majority, yeah.  I mean,

12   that's --

13       Q.   Okay.  And how is it that Proven Industries --

14   well, you don't have individually any profits; right?

15   Because you don't individually sell any product; is that

16   correct?

17       A.   Individually, no.  Capacity --

18       Q.   Okay.

19       A.   -- for me, no.

20       Q.   Okay.

21       A.   Personally.

22       Q.   So how does Proven Industries calculate its --

23   its profits?

24       A.   So we look at it -- I mean, there sure are

25   several ways to look at stuff.  Right.  So the way we
```