UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Ronald Lee, II, and Proven
Industries, Inc.,

       Plaintiffs,               Case No.: 8:24-cv-01667-SDM-UAM

v.

Pacific Lock Company a/k/a Paclock
and Gregory B. Waugh,

       Defendants.
_____/

## PLAINTIFF LEE'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF LIABILITY AS TO COUNT I

Plaintiff Ronald Lee, II ("Mr. Lee"), by and through his undersigned counsel, and pursuant to Fed. R. Civ. P. 56 moves this Court for an Order of Partial Summary Judgment of liability against Defendant Pacific Lock Company a/k/a Paclock ("Paclock") as to Count I – Breach of Mutual Non-Disclosure Agreement for the reasons set forth in the following Memorandum of Law.

MEMORANDUM OF LAW

I.    Background

In 2011, Mr. Lee formed Plaintiff Proven Industries, Inc. ("Proven") with the goal of developing and manufacturing trailer coupler locks, a realm in the security products field that Mr. Lee considered to be "untapped." (DOC. 56-1, Lee Dep. 261:16-262:12). Mr. Lee is the President, founder and sole owner of Proven. (DOC. 56-2, Lee Decl., ¶1). Initially, Mr. Lee, himself, worked on product development

1

and prototype manufacture using out-sourced job shops. (DOC. 56-1, Lee Dep. 72:23-75:11). By 2014, Mr. Lee was still Proven's only employee and still worked another full-time job. (*Id.* at 181:13-182:13). He conceived of a new product known as the 2516 trailer coupler lock and was trying to complete development and bring the product to market. (*Id.* at 85:20-87:18).

Like his first model – the 2178, the 2516 used what is referred to as a puck lock component to secure the device. Puck locks are manufactured by a number of lock manufacturers. Paclock is one such manufacturer.

In 2014, Mr. Lee contacted Paclock as a possible source for puck locks to be incorporated into the 2516 trailer coupler lock. Knowing that Paclock was a manufacturer of various lock products and had the capability of competing with Proven, Mr. Lee asked that Paclock execute a Mutual Nondisclosure Agreement (the "MNDA") before doing business. (DOC. 56-1, Lee Dep. 192:10-20; DOC. 56-2, Lee Decl., ¶5). Apparently interested in securing Proven's puck lock business, Paclock signed the MNDA. Previously, Paclock had never manufactured or sold a trailer coupler lack. (DOC. 56-3, Waugh Oct. 18, 2024 Dep. "2024 Dep." 25:13-15).

### The MNDA

The MNDA is dated August 25, 2014. (DOC. 1-4, Ex. A, attached to this Motion as Ex. A). The NDA states, in pertinent part:

> WHEREAS, Inventor [Mr. Lee] may provide certain CONFIDENTIAL INFORMATION, PROPRIETARY INFORMATION and materials relating to a Trade secret of a

2

coupler trailer lock for trailers that will use a puck style lock (hereinafter "Trade secret") in connection with discussions between Inventor and Recipient [PacLock] regarding Trade secret, forthcoming products, manufacturing, marketing and business plans, or other business arrangements by and between Inventor and Recipient which Inventor seeks to keep confidential….

\* \* \* \* \*

NOW THEREFORE, for and in consideration of the mutual obligations contained herein and for other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby mutually acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

     1. On the understanding that both parties are interested in meeting to consider possible collaboration in developments arising from Inventor's Intellectual Property it is agreed that all information, whether oral, written or otherwise, that is supplied in the course or as a result of so meeting shall be treated as confidential by the Recipient.

     2. The Recipient agrees to accept and hold such CONFIDENTIAL INFORMATION, PROPRIETARY INFORMATION and information concerning said trade secret which is disclosed to Recipient by Inventor in confidence, and to make no disclosure or use of such CONFIDENTIAL INFORMATION, PROPRIETARY INFORMATION, or information concerning said trade secret, for any purpose, other than for the purpose of considering the said collaboration, without obtaining a written agreement of the Inventor after a full and complete disclosure of the terms and conditions of such disclosure.

\* \* \* \* \*

     4. This Agreement applies to both technical and commercial information communicated by either party.

\* \* \* \* \*

3

> 7. Recipient shall not directly or indirectly acquire any interest in, or design, create, manufacture, reengineer, sell or otherwise deal with any item or product, containing, based upon or derived from the CONFIDENTIAL INFORMATION, PROPRIETARY INFORMATION and information concerning said Provisional Patent, except as may be expressly agreed to in writing by Inventor.

<u>Post-MNDA</u>

After the execution of the MNDA, the first thing that Paclock's President and CEO, Defendant Waugh ("Waugh") did was to ask Mr. Lee to "send me some drawings or pictures of what your invention is and maybe there is another alternative [to a problem with the length of the puck lock key] I might be able to figure out." The business relationship between Proven and Paclock then ensued. All products purchased from Paclock were purchased by Mr. Lee's company, Proven. From the start, Paclock understood that it was dealing with Mr. Lee's company, Proven. (DOC. 56-2, Lee Decl., Ex. 1 [Proven 526]).

Initially, Proven's (and Mr. Lee's) focus was on completing the development of the 2516 trailer coupler lock and introducing it into the market. For the next five (5) years, the parties cooperated and did business without any major incidents. Proven purchased all of its puck lock needs from Paclock for both the 2516 and 2178 trailer coupler products. (DOC. 56-2, Lee Decl., ¶9).

In 2019, the relationship between the parties began to unravel. On April 19, 2019, Paclock's President and CEO, Defendant Waugh ("Waugh") wrote Mr. Lee:

4

> And, just so we are all clear, if we cannot get ourselves re-aligned with a new agreement then it will be PACLOCK's intent to produce padlocks for your products, as we have been doing for years, selling them everywhere we can (including Amazon) touting how these locks are truly the "original equipment manufacturer's locks" for your products and do so at a price substantially lower than what we sell them for today.
>
> Whether I sell just one or thousands, it won't really matter to PACLOCK. Rather, the damage that will be dealt will be to Proven directly with its customer base and its bottom line. You will get lots of calls as to why the exact product being sold by Proven is double the cost. I think you'll have a tough time justifying your past sales and any future sales.

(DOC. 56-3, Waugh 2024 Dep. 41:2–42:6; DOC. 56-4, Waugh 2024 Dep. Ex. 3). When Waugh wrote this to Lee, he intended that there would be damage to Proven. (DOC. 56-3, Waugh 2024 Dep. 44:2-13).

Conflicts between the parties persisted. On August 29, 2020. Waugh wrote a patent agent who represented both Paclock and Proven stating: "There is a product from a competitor [referring to Proven and its 2516] that, candidly, we want to copy." (DOC. 56-9, Waugh August 7, 2025 Dep. "2025 Dep." Ex. 21). Then, on September 1, 2020, Waugh wrote to his upper-level staff at Paclock: "here's what I'm thinking. We need 2 versions. Both are [Plaintiffs'] original gangsters, the 2178 and the 2516…. At most, we do 2 versions to start. But I think just one. The rest of them [Plaintiffs' other trailer coupler models] look like they fit weirdo trailers where one model is for an entire family of products from one manufacturer." (DOC. 56-3, Waugh 2024 Dep. 48:7-20 and DOC. 56-5, Waugh 2024

5

Dep. Ex. 4). Waugh was sharing his thinking that Paclock should develop these two products manufactured by Proven to be competitive to Proven's products. (*Id.*).

The next day, Waugh wrote Mr. Lee: "I'll clue you into something here. Remember how you told me on multiple occasions how you jack up your prices because your customers are dumb? That only works if there is no competition, but the moment that there's competition, customers have an alternative. Paclock getting into your business will have a real impact on your business. Your business model will need to have significant changes." (DOC. 56-3, Waugh 2024 Dep. 50:6-24 and DOC. 56-6, Waugh 2024 Dep. Ex. 5).

On September 10th, Waugh wrote Mr. Lee: "What I want to make crystal clear is that I intend to compete with your products…." (DOC. 56-6, Waugh 2024 Dep. Ex. 6). And, even though Mr. Lee reminded Waugh about the MNDA, Paclock did just that. (DOC. 56-2, Lee Decl., ¶10, Ex. 2 [PacLock 48]).

Paclock acquired a copy of Proven's 2516 trailer coupler lock and reverse-engineered it and made a 3D software model used to make assembly drawings for Paclock's UCS-77S-2516 product. (DOC. 56-8, Waugh 2025 Dep. 77:24 – 79:1). Paclock also reverse-engineered Proven's 2178 to create Paclock's UCS-77S-2178. (DOC. 56-8, Waugh 2025 Dep. 84:10 – 85:12). Paclock admits that that it developed slightly different variations of Proven's 2516 and 2178 trailer coupler locks. (DOC. 56-3, Waugh 2024 Dep. 48:17-20).

6

Paclock's first sale of its UCS-77S-2516 was on August 3, 2022. (DOC. 56-10, Waugh 2025 Dep. Ex. 23, PacLock 1973 [redacted]). Paclock's first sale of its UCS-77S-2178 was on August 31, 2022. (DOC. 56-10, Waugh 2025 Dep. Ex. 23, PacLock 1978 [redacted]).

## II.   STATEMENT OF MATERIAL FACTS

1.   Mr. Lee is the President, founder and sole owner of Proven. (DOC. 56-2, Lee Decl., ¶1).

2.   In 2014, Mr. Lee had conceived of a new trailer coupler lock known as the 2516 and was in the process of product development. (DOC. 56-1, Lee Dep. 85:20-87:18).

3.   The 2516 trailer coupler lock used a puck-style of lock to secure the device. (Ex. A, preamble).

4.   Paclock is a manufacturer of puck locks, but had never made or sold trailer coupler locks, previously. (DOC. 56-3, Waugh 2024 Dep. 25:13-15).

5.   Mr. Lee decided to approach Paclock to source his company's needs for puck locks on the new 2516 product.

6.   Because Paclock was a manufacturer of a variety of lock products, Mr. Lee was concerned that disclosure of design, technical and commercial information related to the 2516 product could allow Paclock to make its own trailer coupler locks in competition with him. (DOC. _56-3, Waugh 2024 Dep. 192:10-20; DOC. 56-2, Lee Decl., ¶5).

7

7. Accordingly, Mr. Lee asked Paclock to enter into a Mutual Non-Disclosure Agreement. (Ex. A).

8. Paclock agreed and the MNDA dated August 25, 2014 was executed by the parties. (Ex. A).

9. The MNDA's preamble identifies "a Trade secret of a coupler trailer lock for trailers that will use a puck style lock (hereinafter "Trade secret")" and envisions "discussions between inventor [Mr. Lee] and Recipient [Paclock] regarding Trade secret, forthcoming products, manufacturing, marketing and business plans, or other business arrangements by and between Inventor and Recipient which Inventor seeks to keep confidential…." (Ex. A).

10. Paragraph 7 of the MNDA provides that "Recipient [Paclock] shall not directly or indirectly acquire any interest in, or design, create, manufacture, reengineer, sell or otherwise deal with any item or product, containing, based upon or derived from the CONFIDENTIAL INFORMATION, PROPRIETARY INFORMATION…." (Ex. A).

11. After executing the MNDA, Mr. Lee disclosed the 2516 product to Paclock. (DOC. 56-2, Lee Decl., ¶7).

12. From the outset, Paclock was aware of Mr. Lee's company, Proven. The Paclock account was opened in the name of Proven, all Paclock puck locks were purchased by Proven, all invoices for the Paclock puck locks were directed to Proven and Proven paid all of the invoices. (DOC. 56-2, Lee Decl., ¶8 and Ex. 1).

13. For approximately five (5) years the parties did business until the business relationship began to unravel in 2019.

14. Paclock then decided to copy Proven's 2516 and 2178 trailer coupler locks. (DOC. 56-9, Waugh 2025 Dep., Ex. 21; DOC. 56-3, Waugh 2024 Dep. 48:7-20, 50:6-24; DOC. 56-5, Waugh 2024 Dep. Ex. 4; DOC. 56-6 and 56-7, Waugh 2024 Dep. Exs. 5 & 6).

15. Paclock acquired examples of Proven's 2516 and 2178 products and reverse-engineered them to create Paclock's UCS-77S-2516 and UCS-77S- 2178 trailer coupler locks which Paclock began selling in August 2022. (DOC. 56-8, Waugh 2025 Dep. 77:24–79:1; 84:10–85:12; DOC. 56-10, Waugh 2025 Dep. Ex. 23 [PacLock 1973 redacted & PacLock 1978 redacted]).

### III. ARGUMENT

#### A. Paclock Materially Breached the MNDA

To establish a breach of contract, Mr. Lee must show: (1) that a valid contract existed; and (2) that Paclock materially breached the contract. *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009); *accord Lee v. Pacific Lock Co.*, 2025 U.S. Dist. LEXIS 12928 *17 (M.D. Fla. Jan. 24, 2025).[1] As to validity of the MNDA, there is no dispute regarding offer and acceptance, consideration and the manifestation of mutual assent. *See Jericho All-Weather Opportunity Fund, LP v. Pier Seventeen*

---

[1] Since this motion is for partial summary judgment as to liability only, the question of damages is deferred for trial.

9

*Marina & Yacht Club*, 207 So. 3d 938, 941 (Fla. 4th DCA 2016); *Winter Haven Citrus Growers Ass'n v. Campbell & Sons Fruit Co.*, 773 So. 2d 96, 97 (Fla. 2d DCA 2000).

Here, Mr. Lee offered to do business with Paclock subject to the execution of the MNDA and Paclock agreed to be so bound. The five (5) year history to the ensuing business relationship between Mr. Lee's company, Proven, and Paclock is testament to the consideration. Indeed, after signing the MNDA, Paclock never sought to disavow the agreement.

"To demonstrate a material breach [Mr. Lee] must prove that [Paclock] 'failed to perform a duty that goes to the essence of the contract and is of such significance that it relieves the injured party from further performance of its contractual duties.'" *Focus Management Group USA, Inc. v. King*, 171 F. Supp. 3d 1291. 1297 (M.D. Fla. 2016) (*quoting Burlington & Rockenbach, P.A. v. Law Offices of E. Clay Parker*, 160 So.3d 955, 960 (Fla. 5th DCA 2015). There are no genuine issues of material fact that Paclock breached Paragraph 7 of the MNDA.

The primary purpose of an NDA is to ensure that sensitive information disclosed by one party to another is not misused or disclosed to unauthorized third parties. NDAs are often used in business contexts to facilitate discussions about potential partnerships, transactions, or collaborations while safeguarding proprietary or confidential information. *See e.g., Advice Interactive Grp., LLC v. Web.com Grp., Inc.*, 2017 U.S. Dist. LEXIS 215529 *28-*30 (M.D. Fla. Oct. 20, 2017);

*PB Legacy, Inc. v. Am. Mariculture, Inc.*, 2020 U.S. Dist. LEXIS 62947 *22 (M.D. Fla. April 10, 2020).

The materiality of Paragraph 7 of the MNDA is self-evident. Before Mr. Lee embarked on a business relationship with Paclock and disclosed information regarding his new product, he wanted assurances that Paclock would not use this information to copy his product and compete with him. Yet, based on the undisputed facts, this is exactly what Paclock did.

After five (5) years, when the business relationship soured between Paclock and Mr. Lee and his company, Proven, Paclock stated its intention and desire to copy Proven's 2516 and 2178 products. Paclock internally discussed copying Proven's products. Paclock acquired examples of Proven's 2516 and 2178 products and reverse-engineered them to create assembly drawings for Paclock's UCS-77S-2516 and UCS-77S-2178 products. Waugh concedes that the Paclock products are the same Proven's 2516 and 2178 "with slight variations."

In Paragraph 7 of the MNDA, Paclock agreed that it would not "directly or indirectly acquire any interest in, or design, create, manufacture, reengineer, sell or otherwise deal with any item or product, containing, based upon or derived from the CONFIDENTIAL INFORMATION, PROPRIETARY

INFORMATION…." There is no *bona fide* dispute that this is exactly what Paclock has done in reverse-engineering Proven's 2516 and 2178 products.[2]

### B. The MNDA is not a Non-Competition Covenant Governed by Fla. Stat. 542.335

In Paclock's Third Affirmative Defense, it argues that the MNDA is invalid under Fla. Stat. §542.335. (DOC. 44). Of course, the burden falls upon Paclock to establish this affirmative defense. *Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1552 (11th Cir. 1990).

Nonetheless, the MNDA is not a non-competition agreement. Nowhere in the MNDA does the phrase "non-competition" or "non-compete" appear. Rather, as with most NDAs, the MNDA simply seeks to prevent Paclock from **using** the information received from Mr. Lee to create a version of Mr. Lee's product. There is no prohibition whatsoever from Paclock competing with Proven's 2516 and 2178 trailer coupler hitches using a product design other than Mr. Lee's product design.

It is unsurprising that plaintiff has found no Florida decision construing an NDA as invalid under Fla. Stat. §542.335. For example, in *US Thrillrides, LLC v. Intamin Amusement Rides Int. Corp. Est.*, 767 F. Supp. 3d 1331, 1360-63 (M.D. Fla. 2025), this Court construed a claim for breach of a Confidentiality Non-Disclosure

---

[2] The MNDA is also breached by Paclock's use of Proven's "technical and commercial information" within the meaning of Paragraph 4 of the MNDA. Waugh, himself concedes this in his September 2020 e-mail to Mr. Lee: "Remember how you told me on multiple occasions how you jack up your prices because your customers are dumb?" (DOC. 56-3, Waugh 2024 Dep. 50:6-24; DOC. 56-6, Waugh 2024 Dep. Ex. 5). Waugh is directly admitting that he is using Mr. Lee's commercial information in his decision to compete with Proven to harm Proven's business model.

12

Agreement ("CNDA"). Like the MNDA here, the CNDA in *US Thrillrides* prohibited use of the disclosed Polercoaster roller coaster to design, market or sell amusement rides. The *US Thrillrides* Court did not apply Fla. Stat. §542.335 to the CNDA.

This conclusion squares perfectly with the intent of Fla. Stat. §542.335. Competition is unaffected by NDAs. Why should a party who learns of another party's product be permitted to copy the product for use in the marketplace notwithstanding an NDA? The bound party knowingly agreed to its terms. The bound party can compete with the disclosing party's product. The bound party just can't take advantage of the disclosed party's product to do so.

Take for example an NDA between a soda company and a beverage company that agrees to distribute a particular soda. Competition is not harmed by prohibiting the beverage company from copying the soda. The beverage company is still free to sell other soda products, just not the one learned of through the NDA.

    C.    <u>Even under Fla. Stat. §542.335, the MNDA is valid</u>

Even if the MNDA could be construed as a non-competition agreement subject to Fla. Stat. §542.335, the MNDA remains valid and enforceable. Under Fla. Stat. §542.335(1)(b), legitimate business interests permitting such agreements include: "trade secrets," §542.335(1)(b)(1), and valuable confidential business or professional information that otherwise does not qualify as trade secrets," §542.335(1)(b)(2).

The MNDA by its terms acknowledges the trailer coupler lock as a trade secret. At the time that Mr. Lee disclosed the 2516 to Paclock, the product was still in development and had not been released to the public. This is adequate to establish the 2516 as a trade secret at the time of disclosure under the MNDA. Further, the "commercial and technical information" including "manufacturing, marketing and business plans" is defined under the MNDA. This information imparted by Mr. Lee during the five (5) years of the business relationship, more than suffices along with the knowledge derived by Paclock during the business relationship regarding sales volumes and pricing.

Under §542.335(1)(c), the modest limitation presented by Paragraph 7 of the MNDA is reasonably necessary to protect the legitimate business interests of Mr. Lee and his company. Paragraph 7 of the MNDA does not prohibit Paclock from competing with Proven. It does not even prohibit Paclock from competing in the realm of trailer coupler locks. The only limitation imposed by Paragraph 7 is to prohibit Paclock from copying the disclosed 2516 trailer coupler lock.

Lastly, as to duration, Fla. Stat. §542.335(1)(e) creates a presumption of temporal reasonableness in agreements involving trade secrets where the limitation is 5 years or less from the end of the agreement. Here, the relationship governed by the MNDA ended in 2019. The undisputed facts establish that Paclock began copying the 2516 trailer coupler lock in September 2020. Presumptively, the application of Paragraph 7 would be acceptable even if Fla. Stat. §542.335 applies.

## CONCLUSION

For the foregoing reasons and based upon the establish facts, Plaintiff Lee requests that an Order of Partial Summary Judgment as to liability for the breach of the MNDA be entered against Paclock.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed via CM/ECF on September 30, 2025, which will electronically serve this document to the following:

Richard E. Fee, Esq.
Kathleen M. Wade, Esq.
FEE & JEFFRIES, P.A.
1227 N. Franklin Street
Tampa, Florida 33602
rfee@feejeffries.com
kwade@feejeffries.com
bszabo@feejeffries.com
valeshire@feejeffries.com
*Counsel for Defendants*

          JOHNSON, POPE, BOKOR,
          RUPPEL & BURNS, LLP

          /s/ *Frank R. Jakes*
          **Frank R. Jakes, Esq.**
          Florida Bar No. 372226
          Email frankj@jpfirm.com
          Email mday@jpfirm.com
          400 North Ashley Drive, Suite 3100
          Tampa, FL  33602
          Telephone (813) 225-2500
          Facsimile (813) 223-7118
          *Counsel for Plaintiffs*

#11090209