# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

Ronald Lee, II, and Proven
Industries, Inc.,

           Plaintiffs,          Case No.: 8:24-cv-01667-SDM-UAM

v.

Pacific Lock Company a/k/a Paclock
and Gregory B. Waugh,

           Defendants.

_____/

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs Ronald Lee, II ("Mr. Lee") and Proven Industries, Inc. ("Proven")(collectively "Plaintiffs"), by and through their undersigned counsel, and pursuant to Fed. R. Civ. P. 56, opposes the Motion for Summary Judgment (DOC. 50) of Defendants Pacific Lock Company a/k/a Paclock ("Paclock") and Gregroy B. Waugh ("Waugh")(collectively "Defendants") for the reasons set forth in the following Memorandum of Law.

## MEMORANDUM OF LAW

### I.    Background

In 2011, Mr. Lee formed Plaintiff Proven Industries, Inc. ("Proven") with the goal of developing and manufacturing trailer coupler locks, a realm in the security products field that Mr. Lee considered to be "untapped." (DOC. 56-1, Lee Dep. 261:16-262:12). Mr. Lee is the President, founder and sole owner of Proven. (DOC.

1

56-2, Lee Decl., ¶1). Initially, Mr. Lee, himself, worked on product development and prototype manufacture using out-sourced job shops. (DOC. 56-1, Lee Dep. 72:23-75:11). By 2014, Mr. Lee was still Proven's only employee and still worked another full-time job. (*Id.* at 181:13-182:13). He conceived of a new product known as the 2516 trailer coupler lock and was trying to complete development and bring the product to market. (*Id.* at 85:20-87:18).

Like his first model – the 2178, the 2516 used what is referred to as a puck lock component to secure the device. Puck locks are manufactured by a number of lock manufacturers. Paclock is one such manufacturer.

In 2014, Mr. Lee contacted Paclock as a possible source for puck locks to be incorporated into the 2516 trailer coupler lock. Knowing that Paclock was a manufacturer of various lock products and had the capability of competing with Proven, Mr. Lee asked that Paclock execute a Mutual Nondisclosure Agreement (the "MNDA") before doing business. (DOC. 56-1, Lee Dep. 192:10-20; DOC. 56-2, Lee Decl., ¶5). Apparently interested in securing Proven's puck lock business, Paclock signed the MNDA. Previously, Paclock had never manufactured or sold a trailer coupler lack. (DOC. 56-3, Waugh Oct. 18, 2024 Dep. "2024 Dep." 25:13-15).

<u>The MNDA</u>

The MNDA is dated August 25, 2014. (DOC. 1-4, Ex. A). The NDA states, in pertinent part:

WHEREAS, Inventor [Mr. Lee] may provide certain CONFIDENTIAL INFORMATION, PROPRIETARY INFORMATION and materials relating to a Trade secret of a coupler trailer lock for trailers that will use a puck style lock (hereinafter "Trade secret") in connection with discussions between Inventor and Recipient [PacLock] regarding Trade secret, forthcoming products, manufacturing, marketing and business plans, or other business arrangements by and between Inventor and Recipient which Inventor seeks to keep confidential….

\* \* \* \* \*

NOW THEREFORE, for and in consideration of the mutual obligations contained herein and for other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby mutually acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

1. On the understanding that both parties are interested in meeting to consider possible collaboration in developments arising from Inventor's Intellectual Property it is agreed that all information, whether oral, written or otherwise, that is supplied in the course or as a result of so meeting shall be treated as confidential by the Recipient.

2. The Recipient agrees to accept and hold such CONFIDENTIAL INFORMATION, PROPRIETARY INFORMATION and information concerning said trade secret which is disclosed to Recipient by Inventor in confidence, and to make no disclosure or use of such CONFIDENTIAL INFORMATION, PROPRIETARY INFORMATION, or information concerning said trade secret, for any purpose, other than for the purpose of considering the said collaboration, without obtaining a written agreement of the Inventor after a full and complete disclosure of the terms and conditions of such disclosure.

\* \* \* \* \*

4. This Agreement applies to both technical and commercial information communicated by either party.

3

* * * * *

7. Recipient shall not directly or indirectly acquire any interest in, or design, create, manufacture, reengineer, sell or otherwise deal with any item or product, containing, based upon or derived from the CONFIDENTIAL INFORMATION, PROPRIETARY INFORMATION and information concerning said Provisional Patent, except as may be expressly agreed to in writing by Inventor.

Post-MNDA

After the execution of the MNDA, the first thing that Paclock's President and CEO, Defendant Waugh ("Waugh") did was to ask Mr. Lee to "send me some drawings or pictures of what your invention is and maybe there is another alternative [to a problem with the length of the puck lock key] I might be able to figure out." The business relationship between Proven and Paclock then ensued. All products purchased from Paclock were purchased by Mr. Lee's company, Proven. From the start, Paclock understood that it was dealing with Mr. Lee's company, Proven. (DOC. 56-2, Lee Decl., Ex. 1 [Proven 526]).

Initially, Proven's (and Mr. Lee's) focus was on completing the development of the 2516 trailer coupler lock and introducing it into the market. For the next five (5) years, the parties cooperated and did business without any major incidents. Proven purchased all of its puck lock needs from Paclock for both the 2516 and 2178 trailer coupler products. (DOC. 56-2, Lee Decl., ¶9).

In 2019, the relationship between the parties began to unravel. On April 19, 2019, Paclock's President and CEO, Defendant Waugh ("Waugh") wrote Mr. Lee:

And, just so we are all clear, if we cannot get ourselves re-aligned with a new agreement then it will be PACLOCK's intent to produce padlocks for your products, as we have been doing for years, selling them everywhere we can (including Amazon) touting how these locks are truly the "original equipment manufacturer's locks" for your products and do so at a price substantially lower than what we sell them for today.

Whether I sell just one or thousands, it won't really matter to PACLOCK. Rather, the damage that will be dealt will be to Proven directly with its customer base and its bottom line. You will get lots of calls as to why the exact product being sold by Proven is double the cost. I think you'll have a tough time justifying your past sales and any future sales.

(DOC. 56-3, Waugh 2024 Dep. 41:2—42:6; DOC. 56-4, Waugh 2024 Dep. Ex. 3).

Conflicts between the parties persisted. On August 29, 2020. Waugh wrote a patent agent who represented both Paclock and Proven stating: "There is a product from a competitor [referring to Proven and its 2516] that, candidly, we want to copy." (DOC. 56-9, Waugh August 7, 2025 Dep. "2025 Dep." Ex. 21). Then, on September 1, 2020, Waugh wrote to his upper-level staff at Paclock: "here's what I'm thinking. We need 2 versions. Both are [Plaintiffs'] original gangsters, the 2178 and the 2516…. At most, we do 2 versions to start. But I think just one…" (DOC. 56-3, Waugh 2024 Dep. 48:7-20 and DOC. 56-5, Waugh 2024 Dep. Ex. 4). Waugh was sharing his thinking that Paclock should develop these two products manufactured by Proven to be competitive to Proven's products. (*Id.*).

The next day, Waugh wrote Mr. Lee: "I'll clue you into something here. Remember how you told me on multiple occasions how you jack up your prices

because your customers are dumb? That only works if there is no competition, but the moment that there's competition, customers have an alternative. Paclock getting into your business will have a real impact on your business. Your business model will need to have significant changes." (DOC. 56-3, Waugh 2024 Dep. 50:6-24  and DOC. 56-6, Waugh 2024 Dep. Ex. 5).

On September 10th, Waugh wrote Mr. Lee: "What I want to make crystal clear is that I intend to compete with your products…." (DOC. 56-6, Waugh 2024 Dep. Ex. 6). And, even though Mr. Lee reminded Waugh about the MNDA, Paclock did just that. (DOC. 56-2, Lee Decl., ¶10, Ex. 2 [PacLock 48]).

Paclock acquired a copy of Proven's 2516 trailer coupler lock and reverse-engineered it and made a 3D software model used to make assembly drawings for Paclock's UCS-77S-2516 product. (DOC. 56-8, Waugh 2025 Dep. 77:24 – 79:1). Paclock also reverse-engineered Proven's 2178 to create Paclock's UCS-77S-2178. (DOC. 56-8, Waugh 2025 Dep.  84:10 – 85:12). Paclock admits that that it developed slightly different variations of Proven's 2516 and 2178 trailer coupler locks. (DOC. 56-3, Waugh 2024 Dep. 48:17-20).

Paclock's first sale of its UCS-77S-2516 was on August 3, 2022. (DOC. 56-10, Waugh 2025 Dep. Ex. 23, PacLock 1973 [redacted]). Paclock's first sale of its UCS-77S-2178 was on August 31, 2022. (DOC. 56-10, Waugh 2025 Dep. Ex. 23, PacLock 1978 [redacted]).

Defendants' efforts at respecting and complying with the MNDA were limited and somewhat cavalier. Waugh – as President/CEO of Paclock – handles "high-level communications in [NDA] situations" and does not delegate NDA matters. (DOC. 62-1, Waugh 2024 Dep. 86:7-20). On behalf of Paclock, Waugh maintained the only copy of the MNDA on a laptop that only Waugh had access to. He cannot recall any dates when he might have accessed the MNDA. (DOC. 62-7; Def. Paclock's Answer to Pl.'s First Set of Interrogs., No. 2). Waugh has no e-mails sharing the MNDA with any other Paclock employee. (DOC. 62-2, Waugh 2025 Dep. 22:12-15). Waugh's normal practice is to verbally advise Paclock employees regarding the company's NDA obligations; Waugh cannot recall ever disclosing the MNDA to any Paclock employee. (DOC. 62-2, Waugh 2025 Dep. 23:9-18).

Indeed, no Paclock employee deposed in this case was aware of the MNDA. (See e.g., DOC. 62-3, Fleagane Dep. 75:1-13). Lance Endsley, a National Sales Leader for Paclock, who visited Proven's facilities in November 2018 and met with Mr. Lee was unaware of the MNDA and recalls no conversation with Waugh regarding the need to protect the confidentiality of Proven information. (DOC. 62-4, Endsley Dep. 68:2-12 and 69:3-25)

By April 2019, even Waugh professes to have forgotten about the MNDA. (DOC. 62-8, Def. Waugh's Resp, to Def.'s First Req. for Admis., Nos. 5 and 6).

However, Mr. Lee reminded him of the MNDA on September 10, 2020. (DOC. 56-2, Lee Decl., ¶10, Ex. 2 [PacLock 48]).

II.     STATEMENT OF MATERIAL FACTS AND DISPUTED FACTS

1.      Mr. Lee is the President, founder and sole owner of Proven. (DOC. 56-2, Lee Decl., ¶1).

2.      In 2014, Mr. Lee had conceived of a new trailer coupler lock known as the 2516 and was in the process of product development. (DOC. 56-1, Lee Dep. 85:20-87:18).

3.      The 2516 trailer coupler lock used a puck-style of lock to secure the device. (DOC. 1-4, Ex. A, preamble).

4.      Paclock is a manufacturer of puck locks, but had never made or sold trailer coupler locks, previously. (DOC. 56-3, Waugh 2024 Dep. 25:13-15).

5.      Mr. Lee decided to approach Paclock to source his company's needs for puck locks on the new 2516 product.

6.      Because Paclock was a manufacturer of a variety of lock products, Mr. Lee was concerned that disclosure of design, technical and commercial information related to the 2516 product could allow Paclock to make its own trailer coupler locks in competition with him. (DOC. 56-1, Lee Dep. 192:10-20; DOC. 56-2, Lee Decl., ¶5).

7.      Accordingly, Mr. Lee asked Paclock to enter into a Mutual Non-Disclosure Agreement. (DOC. 1-4, Ex. A).

8.      Paclock agreed and the MNDA dated August 25, 2014 was executed by the parties. (DOC. 1-4, Ex. A).

9.      The MNDA's preamble identifies "a Trade secret of a coupler trailer lock for trailers that will use a puck style lock (hereinafter "Trade secret")" and envisions "discussions between inventor [Mr. Lee] and Recipient [Paclock] regarding Trade secret, forthcoming products, manufacturing, marketing and business plans, or other business arrangements by and between Inventor and Recipient which Inventor seeks to keep confidential…." (DOC. 1-4, Ex. A).

10.     Paragraph 7 of the MNDA provides that "Recipient [Paclock] shall not directly or indirectly acquire any interest in, or design, create, manufacture, reengineer, sell or otherwise deal with any item or product, containing, based upon or derived from the CONFIDENTIAL INFORMATION, PROPRIETARY INFORMATION…." (DOC. 1-4, Ex. A).

11.     The MNDA does not contain a non-competition covenant. (DOC. 1-4, Ex. A).

12.     The Defendants never challenged the pleading sufficiency of Count I under Fla. Stat. § 542.335. (DOCS. 15 and 16).

13.     After executing the MNDA, Mr. Lee disclosed the 2516 product to Paclock. (DOC. 56-2, Lee Decl., ¶7).

14.     From the outset, Paclock was aware of Mr. Lee's company, Proven. The Paclock account was opened in the name of Proven, all Paclock puck locks

were purchased by Proven, all invoices for the Paclock puck locks were directed to Proven and Proven paid all of the invoices. (DOC. 56-2, Lee Decl., ¶8 and Ex. 1).

15.     For approximately five (5) years the parties did business until the business relationship began to unravel in 2019.

16.     Paclock then decided to copy Proven's 2516 and 2178 trailer coupler locks. (DOC. 56-9, Waugh 2025 Dep., Ex. 21; DOC. 56-3, Waugh 2024 Dep. 48:7-20, 50:6-24; DOC. 56-5, Waugh 2024 Dep. Ex. 4; DOCS. 56-6 and 56-7, Waugh 2024 Dep. Exs. 5 and 6).

17.     Paclock acquired examples of Proven's 2516 and 2178 products and reverse-engineered them to create Paclock's UCS-77S-2516 and UCS-77S- 2178 trailer coupler locks which Paclock began selling in August 2022. (DOC. 56-8, Waugh 2025 Dep. 77:24–79:1; 84:10–85:12; DOC. 56-10, Waugh 2025 Dep. Ex. 23 [PacLock 1973 redacted & PacLock 1978 redacted]).

18,     Defendants never disavowed the MNDA.

## III. ARGUMENT

### A.     Paclock Materially Breached the MNDA

Plaintiff Lee has moved for partial summary judgment of liability as to Count I. (DOC. 57) Since partial summary judgment is warranted for Plaintiff Lee, it follows that Defendants' motion for summary judgment on this Count must be denied. Thus. Plaintiff Lee incorporates and relies upon his prior arguments.

There are no genuine issues of material fact that Paclock breached Paragraph 7 of the MNDA. The materiality of Paragraph 7 of the MNDA is self-evident. Before Mr. Lee embarked on a business relationship with Paclock and disclosed information regarding his new product, he wanted assurances that Paclock would not use this information to copy his product and compete with him. Yet, based on the undisputed facts, this is exactly what Paclock did.

After five (5) years, when the business relationship soured between Paclock and Mr. Lee and his company, Proven, Paclock stated its intention and desire to copy Proven's 2516 and 2178 products. Paclock internally discussed copying Proven's products. Paclock acquired examples of Proven's 2516 and 2178 products and reverse-engineered them to create assembly drawings for Paclock's UCS-77S-2516 and UCS-77S-2178 products. Waugh concedes that the Paclock products are the same Proven's 2516 and 2178 "with slight variations."

In Paragraph 7 of the MNDA, Paclock agreed that it would not "directly or indirectly acquire any interest in, or design, create, manufacture, reengineer, sell or otherwise deal with any item or product, containing, based upon or derived from the CONFIDENTIAL INFORMATION, PROPRIETARY INFORMATION…." There is no *bona fide* dispute that this is exactly what Paclock has done in reverse-engineering Proven's 2516 and 2178 products.[1]

---

[1] The MNDA is also breached by Paclock's use of Proven's "technical and commercial information" within the meaning of Paragraph 4 of the MNDA. Waugh, himself concedes this in his September 2020 e-mail to Mr. Lee: "Remember how you told me on multiple occasions how

In Paclock's Third Affirmative Defense, it argues that the MNDA is invalid under Fla. Stat. §542.335. (DOC. 44). Of course, the burden falls upon Paclock to establish this affirmative defense. *Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1552 (11th Cir. 1990).

The MNDA is not a non-competition agreement. Nowhere in the MNDA does the phrase "non-competition" or "non-compete" appear. Rather, as with most NDAs, the MNDA simply seeks to prevent Paclock from **using** the information received from Mr. Lee to create a version of Mr. Lee's product. There is no prohibition whatsoever from Paclock competing with Proven's 2516 and 2178 trailer coupler hitches using a product design other than Mr. Lee's product design.

It is unsurprising that plaintiff has found no Florida decision construing an NDA as invalid under Fla. Stat. §542.335. For example, in *US Thrillrides, LLC v. Intamin Amusement Rides Int. Corp. Est.*, 767 F. Supp. 3d 1331, 1360-63 (M.D. Fla. 2025), this Court construed a claim for breach of a Confidentiality Non-Disclosure Agreement ("CNDA"). Like the MNDA here, the CNDA in *US Thrillrides* prohibited use of the disclosed Polercoaster roller coaster to design, market or sell

---

you jack up your prices because your customers are dumb?" (DOC. 56-3, Waugh 2024 Dep. 50:6-24; DOC. 56-6, Waugh 2024 Dep. Ex. 5). Waugh is directly admitting that he is using Mr. Lee's commercial information in his decision to compete with Proven to harm Proven's business model.

amusement rides. The *US Thrillrides* Court did not apply Fla. Stat. §542.335 to the CNDA.

This conclusion squares perfectly with the intent of Fla. Stat. §542.335. Competition is unaffected by NDAs. Why should a party who learns of another party's product be permitted to copy the product for use in the marketplace notwithstanding an NDA? The bound party knowingly agreed to its terms. The bound party can compete with the disclosing party's product. The bound party just can't take advantage of the disclosed party's product to do so.

### C.    Even under Fla. Stat. §542.335, the MNDA is valid

Even if the MNDA could be construed as a non-competition agreement subject to Fla. Stat. §542.335, the MNDA remains valid and enforceable. Under Fla. Stat. §542.335(1)(b), legitimate business interests permitting such agreements include: "trade secrets," §542.335(1)(b)(1), and valuable confidential business or professional information that otherwise does not qualify as trade secrets," §542.335(1)(b)(2).

The MNDA by its terms acknowledges the trailer coupler lock as a trade secret. At the time that Mr. Lee disclosed the 2516 to Paclock, the product was still in development and had not been released to the public. This is adequate to establish the 2516 as a trade secret at the time of disclosure under the MNDA. Further, the "commercial and technical information" including "manufacturing, marketing and business plans" is defined under the MNDA. This information

imparted by Mr. Lee during the five (5) years of the business relationship, more than suffices along with the knowledge derived by Paclock during the business relationship regarding sales volumes and pricing.

Under §542.335(1)(c), the modest limitation presented by Paragraph 7 of the MNDA is reasonably necessary to protect the legitimate business interests of Mr. Lee and his company. Paragraph 7 of the MNDA does not prohibit Paclock from competing with Proven. It does not even prohibit Paclock from competing in the realm of trailer coupler locks. The only limitation imposed by Paragraph 7 is to prohibit Paclock from copying the disclosed 2516 trailer coupler lock.

Lastly, as to duration, Fla. Stat. §542.335(1)(e) creates a presumption of temporal reasonableness in agreements involving trade secrets where the limitation is 5 years or less from the end of the agreement. Here, the relationship governed by the MNDA ended in 2019. The undisputed facts establish that Paclock began copying the 2516 trailer coupler lock in September 2020. Presumptively, the application of Paragraph 7 would be acceptable even if Fla. Stat. §542.335 applies.

E. <u>Other Challenges to the MNDA Breach of Contract Claim</u>

Defendants also challenge Plaintiff Lee's entitlement to relief for breach of the MNDA because his wholly owned company, Proven, has suffered damages in the form of lost sales, not him. First, this argument overlooks the fact that Mr. Lee is entitled to injunctive relief for the breached MNDA. Second, it is undisputed in the record that – from the signing of the MNDA and the very inception of the

relationship – Paclock recognized Proven as the party in interest in the relationship. Thus, at least, a *bona fide* fact issue exists as to the Plaintiffs' entitlement to recover damages in the form of lost sales by Proven.

Next, Defendants manufacture an unpled affirmative defense that Paclock materially relied to its detriment upon a clerical error referencing a provisional patent when entering the MNDA. This affirmative defense has not been pled; it is waived. (See DOC. 44).

### D. Disputed Issues of Material Fact Permeate Plaintiffs' DTSA and FUTSA Trade Secret Misappropriation Claims

"Courts are extremely hesitant to grant summary judgment regarding the fact-intensive questions of the existence of a trade secret or whether a plaintiff took reasonable steps to protect its trade secrets." *Furmanite America, Inc. v. T.D. Williamson, Inc.,* 506 F. Supp. 2d 1134, 1141 (M.D. Fla. 2007). "The term 'trade secret' is one of the most elusive and difficult concepts in the law to define. The question of whether an item taken from an employer constitutes a 'trade secret,' is of the type normally resolved by a fact finder after full presentation of evidence from each side." *Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*, 569 F.2d 286, 289 (5th Cir. 1978).

### 1. Existence of a Trade Secret

The existence of a trade secret or trade secrets is typically an issue of fact to be resolved by the jury after full presentation of the evidence. *Crystal Lagoons U.S. Corp. v. Oasis Amenities, LLC*, 2025 U.S. Dist. LEXIS 151629, *18 (M.D. Fla. 2025);

*accord Compulife Software, Inc. v. Newman,* 959 F.3d 1288, 1311 (11th Cir. 2020);

*Yellowfin Yachts, Inc. v. Barker Boaatworks, LLC,* 898 F.3d at 1278, 1298-99 (11th Cir.

2018).

A trade secret is

(1) "information" (including a formula, pattern, compilation, program, device, method, technique or process) that

(2) derives actual or potential independent economic value from not being generally known to or ascertainable by others who can obtain economic value from its disclosure or use, and

(3) is the subject of efforts reasonable under the circumstances to maintain its secrecy.

See 18 U.S.C. § 1839(3); Fla. Stat. § 688.002(4). The elements of a claim under the

two statutes are substantially the same. *Compulife Software Inc. v. Newman*, 959 F.3d

1288, 1311 n.13 (11th Cir. 2020).

Here, the factual record begins with a contractual acknowledgement by

Defendants that Mr. Lee "may provide certain CONFIDENTIAL INFORMATION,

PROPRIETARY INFORMATION and materials relating to a Trade secret of a

coupler trailer lock for trailers that will use a puck style lock (hereinafter "Trade

secret")…" (DOC. 1-4, Ex. A). The record is devoid of any statements or

contentions by Defendants during the parties' five (5) year business relationship

that Plaintiffs' 2516 trailer coupler lock was ***not*** a trade secret.

When the MNDA was executed in 2014, Defendants' design and

manufacturing techniques for its 2516 trailer coupler lock were not publicly

known. (*See* DOC. 62-5, Lee Dep. 84:25-91:19 and 238:2-17). Mr. Lee was still developing it. Defendants argue that Plaintiffs' use of job shops to prepare CADD drawings or fabricate prototypes rendered the 2516 design "public" or "non-secret" because there were no formal written non-disclosure agreements in place with these job shops. (*See* DOC. 50 at 17) In fact, the only job shop deposed in this action, Laser Dynamics, Inc. (DOC. 62-6, Herberg Dep. 31:19-32:5), testified that its standard operating practice was to maintain the confidentiality of customer drawings, never to distribute customer drawings to third parties or discuss customer drawings with anyone other than the customer.

"[T]rade secret protection does not require absolute secrecy; relative secrecy will suffice, that is, 'secrecy sufficient to confer an actual or potential economic advantage upon one who possesses the information." *Crystal Lagoons U.S. Corp. v. Oasis Amenities, LLC,* Case No: 8:23-cv-519-TP B-AEP, 2025 U.S. Dist. LEXIS 151629 *15 (M.D. Fla. Aug. 7, 2025) (quoting Restatement (Third) of Unfair Competition, § 39, comment f). "The secrecy requirement is generally treated as a relative concept and requires a fact-intensive analysis." *Hurry Family Revocable Tr. v. Frankel,* No. 8:18-cv-2869-CEH-CPT, 2023 U.S. Dist. LEXIS 534, 2023 WL 23805, at *7 (M.D. Fla. Jan. 3, 2023).

In this regard, Plaintiffs' testimony is clear. Plaintiffs relied upon the business norm that job shops protect the confidentiality of their customers. The only third-party record testimony in the record in this respect is that of Laser

Dynamics, Inc., confirming such a standard operating practice of maintaining is observed. Defendants cannot and have not pointed to any record evidence that any of the job shops used by Plaintiffs for the development of its 2516 trailer coupler lock deviated from this standard operating practice and publicly disclosed the design of Plaintiffs 2516.

Defendants also suggest that any trade secret protection for 2516 design was lost when Proven began selling the 2516 trailer coupler locks in late 2015. Defendants argue that anyone could then buy the product, observe the design characteristics and replicate the product. While this is a trial argument for the Defendants, it is not undisputed. (DOC. 62-5, Lee Dep. 273:7-274:25).

Yet, Defendants' singular focus upon the design of the 2516 trailer coupler lock is a strawman. When the parties entered the NDA, Plaintiffs disclosed not only the design of the unknown design of the 2516 trailer coupler lock, they also disclosed the use of steel fabrication rather than cast iron, and shared market research that the trailer coupler lock niche was "untapped" (*See* DOC. 62-5, Lee Dep. 260:7-23 and 261:21-262:12) Perhaps more significantly, by signing the MNDA and engaging in business with Plaintiffs, Defendants were given the proverbial "key" to Proven's trailer coupler lock business.

Not only were Defendants privy to information disclosed directly by Plaintiffs regarding the ongoing growth of the business and the performance of the 2516 in the market, Defendants gleaned the actual volume of Plaintiffs trailer

coupler locks since Defendants were the sole source of the key puck lock component. Contrary to Defendants contention (see DOC. 50 at 19), Defendants would never have had access to this proprietary business information through "legitimate means" without signing and breaching the MNDA. Unit sales volume can constitute a trade secret under both federal and Florida law. *E.g., Nephron Pharms. Corp. v. Hulsey,* Case No: 6:18-cv-1573-Orl-31LRH, 2020 U.S. Dist. LEXIS 243827 *31 - *37 (M.D. Fla. Oct. 7, 2020).

Likewise, as a manufacturer of other lock products, Defendants had the ability to learn the approximate profit margins generated by Plaintiffs' sales of its trailer coupler locks particularly since Defendants knew the price they charged Defendants for the puck locks. Profit margin information is also recognized as being a protectible trade secret. *E.g., Confianca Moving v. De Oliveira*, Case No.10-23035-CIV-MORENO/TORRES, 2011 U.S. Dist. LEXIS 175122, *15 (S.D. Fla. Jan. 24, 2011); Thomas v. Alloy Fasteners, Inc., 664 So. 2d 59, 60 (Fla. 5th DCA 1995).

While Defendants have arguments for the jury that Plaintiffs' trade secrets are either non-protectible or publicly known, these arguments are disputed in the record and warrant resolution by the jury.

## 2. Misappropriation

It is undisputed in the record that Defendants consciously and deliberately copied Plaintiffs' 2516 and 2178 trailer coupler locks to create their competing trailer lock products It is also evident from the record that Defendants embarked

on this effort after five (5) years of learning about Plaintiffs' trailer coupler lock business through the collaboration governed by the MNDA.

Defendants incorrectly contend that any information provided by Plaintiffs came in 2014. This is not so. The business relationship and communications continued throughout the five (5) year business relationship. (*See* DOC. 62-5, Lee Dep. 242:22–243:17) Defendants gleaned Plaintiffs unit sales volumes and approximate profit margins throughout this five (5) year period. Thus, Defendants' suggestion is simply wrong that this information was stale when Defendants began copying the 2516 in 2020, the year after the relationship soured.

Further, any suggestion that Defendants did not actually use any of the unit sales volume or approximate profit margin information is highly contested. Use of ephemeral trade secret information of this nature is difficult to prove. That is why non-disclosure agreements such as the MNDA in this case are employed.

However, in his pique, Waugh proves the existence of this information and well as its use. On September 2, 2020, Waugh told Mr. Lee: "I'll clue you into something here*. Remember how you told me on multiple occasions how you jack up your prices because your customers are dumb?* That only works if there is no competition, but the moment that there's competition, customers have an alternative. Paclock getting into your business will have a real impact on your business. Your business model will need to have significant changes." (DOC. 56-3, Waugh 2024 Dep. 50:6-24 and DOC. 56-6, Waugh 2024 Dep. Ex. 5). Waugh

admits that he and Mr. Lee discussed profit margins and Waugh pointedly threatens to use this information to copy Plaintiffs' trailer coupler locks. This is a threat that was carried out.

## CONCLUSION

For the foregoing reasons and based upon the establish facts and existence of genuinely disputed material facts, Plaintiffs requests that Defendants' Motion for Summary Judgment be denied in its entirety.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed via CM/ECF on October 17, 2025, which will electronically serve this document to the following:

> Richard E. Fee, Esq.
> Kathleen M. Wade, Esq.
> FEE & JEFFRIES, P.A.
> 1227 N. Franklin Street
> Tampa, Florida 33602
> rfee@feejeffries.com
> kwade@feejeffries.com
> bszabo@feejeffries.com
> valeshire@feejeffries.com
> *Counsel for Defendants*

JOHNSON, POPE, BOKOR,
RUPPEL & BURNS, LLP

/s/ *Frank R. Jakes*
**Frank R. Jakes, Esq.**
Florida Bar No. 372226

Email frankj@jpfirm.com
Email mday@jpfirm.com
400 North Ashley Drive, Suite 3100
Tampa, FL  33602
Telephone (813) 225-2500
Facsimile (813) 223-7118
*Counsel for Plaintiffs*

#11152210